No. 22-1716

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

JERRY CINTRON,

*Plaintiff-Appellee*,

v.

PAUL BIBEAULT, in his official and individual capacity; RUI DINIZ, in his official and individual capacity; MATTHEW KETTLE, in his official and individual capacity; PATRICIA ANNE COYNE-FAGUE, in her individual capacity; WAYNE T. SALISBURY, JR., Interim Director, in his official capacity; SPECIAL INVESTIGATOR STEVE CABRAL, in his official and individual capacity; JEFFREY ACETO, in his individual and official capacity; LYNNE CORRY, in her individual and official capacity,

*Defendants-Appellants*,

LT. HAYES, in his official and individual capacity; LT. MOE, in his official and individual capacity; LT. BUSH, in his official and individual capacity; JENNIFER CHAPMAN, in her official and individual capacity; "COUNSELOR" FRANCO, in her official and individual capacity,

*Defendants*.

On Appeal from the U.S. District Court for the District of Rhode Island
Case No. 1:19-cv-497; Chief Judge John J. McConnell

## CORRECTED BRIEF OF PLAINTIFF-APPELLEE JERRY CINTRON

Natalia Friedlander
Jennifer L. Wood
RHODE ISLAND CENTER FOR JUSTICE
One Empire Plaza, Ste. 410
Providence, RI 02903
(401) 491-1101
nfriedlander@centerforjustice.org
jwood@centerforjustice.org

Daniel M. Greenfield*
Kathrina Szymborski Wolfkot**
Felipe Hernandez***
Benjamin Gunning
RODERICK & SOLANGE
 MACARTHUR JUSTICE CENTER
501 H St. NE, Ste. 275
Washington, DC 20002
(202) 869-3450
kathrina.wolfkot@macarthurjustice.org

*Admitted only in Illinois, admission to D.C. pending.
**Admitted only in New York; not admitted in D.C. Practicing under the supervision of the Roderick & Solange MacArthur Justice Center.
***Admitted only in California; not admitted in D.C. Practicing under the supervision of the Roderick & Solange MacArthur Justice Center.

*Counsel for Plaintiff-Appellee Jerry Cintron*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUES ............................................................................ 1

INTRODUCTION ................................................................................................... 2

STATEMENT OF THE CASE ............................................................................... 4

I.   Factual Background ....................................................................................... 4

   A.   Cintron, Who Suffers From Opioid Use Disorder, Is Denied Addiction
   Treatment In The RIDOC And Nearly Dies From Overdosing. .......................... 4

   B.   Defendants Threaten Cintron With Solitary Confinement To Coerce Him To
   Snitch. ................................................................................................................... 9

   C.   Cintron Is "Buried Alive" In Solitary Confinement ...................................... 10

      1.   Deprived Of Virtually All Human Contact, Cintron Deteriorates. ............. 11

      2.   Prison Officials Have Long Known That Solitary Confinement Is
      Destructive. ....................................................................................................... 15

      3.   The Settled Science Of Solitary Confinement ........................................... 20

II.   Procedural History ...................................................................................... 23

SUMMARY OF ARGUMENT ............................................................................ 24

STANDARD OF REVIEW .................................................................................. 26

ARGUMENT ........................................................................................................ 27

I.   Holding Cintron In Solitary Confinement For Years While Depriving Him Of
Necessary Medical Treatment Plausibly Violates The Eighth Amendment. .......... 27

   A.   Cintron's Physical And Psychological Degradation From Solitary
   Confinement And His Lack of Medical Care Are Serious Harms. ...................... 27

   B.   Defendants Knowingly Disregarded The Risks To Cintron. ......................... 36

II.   Defendants Are Not Entitled To Qualified Immunity .................................... 44

III.   Cintron's Injunctive Claim Is Not Moot. ..................................................... 53

IV.   This Court Lacks Interlocutory Jurisdiction Over Cintron's Abuse-Of-
Process Claim ........................................................................................................ 54

CONCLUSION .........................................................................................55

CERTIFICATE OF COMPLIANCE...............................................................56

CERTIFICATE OF SERVICE ....................................................................57

## TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Alspaugh v. McConnell,*
643 F.3d 162 (6th Cir. 2011) ............................................................ 39

*Apodaca v. Raemisch,*
139 S. Ct. 5 (2018) ...................................................................... 11, 12

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................... 26

*Beers-Capitol v. Whetzel,*
256 F.3d 120 (3d Cir. 2001) ............................................................ 47

*Berkshire v. Dahl,*
928 F.3d 520 (6th Cir. 2019) .......................................................... 37

*Blackmore v. Kalamazoo Cnty.,*
390 F.3d 890 (6th Cir. 2004) .......................................................... 52

*Brawner v. Scott Cty.,*
14 F.4th 585 (6th Cir. 2021) ........................................................... 35

*Browder v. City of Albuquerque,*
787 F.3d 1076 (10th Cir. 2015) ...................................................... 52

*City of Mesquite v. Aladdin's Castle, Inc.,*
455 U.S. 283 (1982) ....................................................................... 53

*Clark v. Coupe,*
55 F.4th 167 (3d Cir. 2022) ............................................... 30, 40, 42

*Comstock v. McCrary,*
273 F.3d 693 (6th Cir. 2001) .......................................................... 39

*Davenport v. DeRobertis,*
844 F.2d 1310 (7th Cir. 1988) .................................................. 48, 50

*Davis v. Ayala,*
576 U.S. 257 (2015) ......................................................... 3, 11, 12, 20

iii

*De'Lonta v. Angelone*,
   330 F.3d 630 (4th Cir. 2003) ...............................................................51

*Dean v. Jones*,
   984 F.3d 295 (4th Cir. 2021) ...............................................................47

*Delaney v. DeTella*,
   256 F.3d 679 (7th Cir. 2001) ...............................................................38

*District of Columbia v. Wesby*,
   138 S. Ct. 577 (2018)...........................................................................46

*Duponte II v. Wall*,
   No. 17-397-JJM-LDA, ECF 186 (D.R.I. Jan. 22, 2018) ....................41

*Estelle v. Gamble*,
   429 U.S. 97 (1976)..........................................................................27, 52

*Eves v. LePage*,
   927 F.3d 575 (1st Cir. 2019) (en banc)...............................................45

*Farmer v. Brennan*,
   511 U.S. 825 (1994)..........................................................27, 28, 36, 47

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000).............................................................................53

*Gee v. Pacheco*,
   627 F.3d 1178 (10th Cir. 2010) ...........................................................37

*Goldman v. Fed. Bureau of Prisons*,
   768 F. App'x 714 (9th Cir. 2019).........................................................35

*Greeno v. Dailey*,
   414 F.3d 645 (7th Cir. 2005) ...............................................................52

*Hardwick v. Cnty. of Orange*,
   844 F.3d 1112 (9th Cir. 2017) .............................................................47

*Harris v. Perry*,
   No. CA 15-222-ML, 2015 WL 4879042 (D.R.I. July 15, 2015).........29

iv

*Hazen v. Pasley*,
768 F.2d 226 (8th Cir. 1985) ...............................................................30

*Hinojosa v. Livingston*,
807 F.3d 657 (5th Cir. 2015) ...........................................................42, 43

*Hope v. Pelzer*,
536 U.S. 730 (2002).............................................................44, 45, 46, 52

*Hudson v. McMillian*,
503 U.S. 1 (1992)................................................................................48

*Hutto v. Finney*,
437 U.S. 678 (1978)............................................................................50

*Jackson v. Meachum*,
699 F.2d 578 (1st Cir. 1983)...............................................................29

*Jensen v. Thornell*,
No. CV-12-00601-PHX-ROS, 2023 WL 2838040 (D. Ariz. Apr. 7,
2023) .................................................................................................35

*Johnson v. Levine*,
588 F.2d 1378 (4th Cir. 1978) .............................................................51

*Keenan v. Hall*,
83 F.3d 1083 (9th Cir. 1996) ..........................................................50, 51

*Limone v. Condon*,
372 F.3d 39 (1st Cir. 2004)..................................................................45

*Longtin v. D'Ambra Constr. Co.*,
588 A.2d 1044 (R.I. 1991)...................................................................54

*Lucas v. Chalk*,
785 F. App'x 288 (6th Cir. 2019).........................................................39

*Martinez v. Garden*,
430 F.3d 1302 (10th Cir. 2005) ...........................................................34

*McCoy v. Alamu*,
141 S. Ct. 1364 (2021)....................................................................45, 52

*McElligott v. Foley*,
  182 F.3d 1248 (11th Cir. 1999) ...............................................................30, 40, 43

*In Re Medley*,
  134 U.S. 160 (1890)...................................................................................16, 49

*Melendez v. Sec'y, Fla. Dep't of Corr.*,
  No. 21-13455, 2022 WL 1124753 (11th Cir. Apr. 15, 2022)............................30

*Mims v. Shapp*,
  744 F.2d 946 (3d Cir. 1984) ...................................................................44

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985)...................................................................................54

*Moore v. Duffy*,
  255 F.3d 543 (8th Cir. 2001) ...................................................................39

*Moore v. Mabus*,
  976 F.2d 268 (5th Cir. 1992) ...................................................................36

*Olive v. Wexford Corp.*,
  494 F. App'x 671 (7th Cir. 2012) .............................................................37

*Olson v. Bloomberg*,
  339 F.3d 730 (8th Cir. 2003) ...................................................................37

*Palakovic v. Wetzel*,
  854 F.3d 209 (3rd Cir. 2017) ..........................................................*passim*

*Pearson v. Callahan*,
  555 U.S. 223 (2009).................................................................................45

*Perez v. Cox*,
  788 F. App'x 438 (9th Cir. 2019) .............................................................42

*Pérez-Acevedo v. Rivero-Cubano*,
  520 F.3d 26 (1st Cir. 2008).....................................................................26

*Perry v. Roy*,
  782 F.3d 73 (1st Cir. 2015).........................................................34, 35, 39, 52

*Pesce v. Coppinger*,
   355 F. Supp.3d 35 (D. Mass. 2018)................................................................*passim*

*Phelps v. Kapnolas*,
   308 F.3d 180 (2d Cir. 2002) ...............................................................30, 43

*Porter v. Clarke*,
   923 F.3d 348 (4th Cir. 2019) ...................................................................*passim*

*Porter v. Pa. Dep't of Corr.*,
   974 F.3d 431 (3d Cir. 2020) ...........................................31, 33, 38, 45

*Prude v. Clarke*,
   675 F.3d 732 (7th Cir. 2012) ...............................................................30, 50

*R.G. Fin. Corp. v. Vergara-Nuñez*,
   446 F.3d 178 (1st Cir. 2006)...............................................................26, 44

*Rahman X v. Morgan*,
   300 F.3d 970 (8th Cir. 2002) .......................................................................29

*Rhodes v. Chapman*,
   452 U.S. 337 (1981)........................................................................................43

*Ruiz v. Texas*,
   137 S. Ct. 1246 (2017).....................................................................................11

*Sanders v. Melvin*,
   873 F.3d 957 (7th Cir. 2017) ...............................................................32

*Sanville v. McCaughtry*,
   266 F.3d 724 (7th Cir. 2001) ...............................................................30, 51

*Shepherd v. Dallas Cnty.*,
   591 F.3d 445 (5th Cir. 2009) ...............................................................42

*Taylor v. Riojas*,
   141 S. Ct. 52 (2020)....................................................................45, 52

*Thomas v. Bryant*,
   614 F.3d 1288 (11th Cir. 2010) ...............................................................32, 44

*Thorpe v. Clarke*,
  37 F.4th 926 (4th Cir. 2022) ................................................................29, 46, 47

*Torraco v. Maloney*,
  923 F.2d 231 (1st Cir. 1991)..........................................................................27

*Walker v. Benjamin*,
  293 F.3d 1030 (7th Cir. 2002) .......................................................................47

*Walker v. Schult*,
  717 F.3d 119 (2d Cir. 2013) ..........................................................................51

*Walker v. Shansky*,
  28 F.3d 666 (7th Cir. 1994) ...........................................................................50

*Wallace v. Baldwin*,
  895 F.3d 481 (7th Cir. 2018) .........................................................................32

*Wilkinson v. Austin*,
  545 U.S. 209 (2005)........................................................................................12

*Williams v. Sec'y Pa. Dep't of Corr.*,
  848 F.3d 549 (3d Cir. 2017) .....................................................................29, 31

**Statutes**

*An Act in Amendment of an Act Entitled an Act Concerning Crimes
  and Punishments* (Jan. 18, 1843).................................................................16

Rhode Island's Tort Liability Act, R.I. Gen. Laws § 9-31 .....................................54

**Other Authorities**

About Opioid Abuse and Addiction, Presentation to Senate Judiciary
  Committee (Jan. 27, 2016), https://archives.nida.nih.gov/about-
  nida/legislative-activities/testimony-to-congress/2016/what-
  science-tells-us-about-opioid-abuse-and-addiction .............................................7

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental
  Disorders* (5th ed. 2013)..................................................................................6

Andrea Fenster, *New data: Solitary confinement increases risk of premature death after release,* Prison Policy Initiative (Oct. 13, 2020) ..............................................................................................21

Associated Press, *A peek into opioid users' brains as they try to quit,* NBC News (July 9, 2019).........................................................................6

CDC, *Lifesaving Naloxone* (last reviewed Apr. 21, 2023).........................................8

CDC, *Treat Opioid Use Disorder* (last reviewed Nov. 19, 2020), https://www.cdc.gov/opioids/overdoseprevention/treatment.html......................7

Chad S. Briggs et al., *The Effect of Supermaximum Security Prisons on Aggregate Levels of Institutional Violence*, 41 Criminology 1341 (2003)...........................................................................................18

Christine Vestal, *This State Has Figured Out How to Treat Drug-Addicted Inmates*, Pew (Feb. 26, 2020).................................................................6

*Corrections Withstands COVID*, American Association for the Treatment of Opioid Dependence, Inc., http://www.aatod.org/rhode-island-model-of-moud-in-corrections-withstands-covid/ (last visited May 4, 2023)......................................................42

Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124 (2003).........20, 22, 33

Craig Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 Nw. U.L. Rev. 211 (2020)..................................................20, 21

Dana G. Smith, *Neuroscientists Make a Case Against Solitary Confinement*, Scientific American (Nov. 9, 2018) .............................................22

Daniella Johner, *"One Is the Loneliest Number": A Comparison of Solitary Confinement Practices in the United States and the United Kingdom*, 7 Penn St. J.L. & Int'l. Aff. 229 (2019) ...........................................12

David H. Freedman, *How the Opioid Backlash Went Wrong*, Newsweek (May 3, 2023)...............................................................................4

David Lovell & Clark Johnson, *Felony and Violent Recidivism Among Supermax Prison Inmates in Washington State: A Pilot Study* (2004)..........................................................................................................19

David M. Shapiro, *Solitary Confinement in the Young Republic*, 133 Harv. L. Rev 542, 577 (2019)...................................................................12, 13, 15

Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement Is Cruel and Far Too Usual Punishment*, 90 Ind. L.J. 741 (2015)...............................................................................................20

FDA, News Release, *FDA takes new steps to encourage the development of novel medicines for the treatment of opioid use disorder* (Aug. 6, 2018) ...................................................................39

Food and Drug Administration, News Release, *FDA takes new steps to encourage the development of novel medicines for the treatment of opioid use disorder* (Aug. 6, 2018)..............................................7

G. de Beaumont & A. de Toqueville, *On the Penitentiary System in the United States, and Its Application in France* 5 (Francis Lieber ed. & trans., Philadelphia, Carey, Lea & Blanchard 1833)................................15

George T. Wilkerson, *It's Surprisingly Tough to Avoid Snitching in Prison*, Marshall Project (July 19, 2018)..............................................9

Gerald Rich & Eli Hager, *Shifting Away from Solitary,* The Marshall Project (Dec. 23, 2014) ...................................................................19

Governor Gina Raimondo, Executive Order 17-07, *Taking Further Actions to Address the Opioid Crisis* (July 12, 2017) .........................................6

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006) ...................................................................22, 33

Jacob Gershman, *Why Life for 'Snitches' has Never Been More Dangerous*, Wall St. J. (June 20, 2017)..............................................9

Jayne Leonard, *What are the effects of solitary confinement on health?*, Medical News Today (Aug. 7, 2020) ...................................................22

Jed Rakoff, *Why Innocent People Plead Guilty*, New York Review of Books (Nov. 20, 2014)...................................................................10

Jennifer Latson, *Can America Recover from Addiction?With Opioid Overdoses Still on the Rise, It's Hard to See the Path to Healing*, Boston Globe (Aug. 14, 2022)...................................................................4

x

John F. Stinneford, *Experimental Punishments*, 95 Notre Dame L. Rev. 39, 40 (2019) ...................................................................................15

Jules Lobel & Huda Akil, *Law & Neuroscience: The Case of Solitary Confinement,* 147 Daedalus 61 (2018) ................................................31

Kayla James & Elana Vanko, *The Impacts of Solitary Confinement*, Vera Institute (2021) ...............................................................21, 22, 23, 31

Keramet Reiter, et al., *Psychological Distress in Solitary Confinement: Symptoms, Severity, and Prevalence in the United States, 2017-2018*, American Journal of Public Health (2020).........................22

Kyle Spencer, *Opioids on the Quad*, N.Y. Times (Oct. 30, 2017)............................5

Laura Amato et al., *Psychosocial combined with agonist maintenance treatments versus agonist maintenance treatments alone for treatment of opioid dependence*, Cochrane Database Systemic Rev. (2011) ...............................................................................................6

Lillian Pickett, Leela Berman, & Deborah Marini, *The Prison Within the Prison: A Look at RI's Supermaximum Prison* (Feb. 2, 2023).....................17

Marc A. Levin, Esq., *Testimony Before the U.S. Senate Judiciary Subcommittee on The Constitution, Civil Rights and Human Rights* (2014)...............................................................................................19

Mariposa McCall, MD, *Health and Solitary Confinement: Issues and Impact*, Psychiatric Times (March 16, 2022) ......................................21

Matthew O'Brian, *Former Rhode Island prison warden fights inmate isolation*, Providence Journal (Apr. 8, 2016).......................................17

Mulvaney, *Solitary confinement: RI bill would limit its use in prisons* .................20

N. John Bosomworth, MD*, The downside of weight loss,* National Library of Medicine (May 2012)..................................................29

National Alliance on Mental Illness, *Solitary Confinement* ...................................21

National Institute on Drug Abuse, *Effective Treatments for Opioid Addiction* (last updated Nov. 2016).......................................7, 34, 39

National Institute on Drug Abuse, *What Science tells us About Opioid Abuse and Addiction,* Nora D. Wolkow Testimony to Congress (Jan. 27, 2016)......................................................................................39

NEMSIS, *Nonfatal Overdose Surveillance Dashboard*, https://nemsis.org/opioid-overdose-tracker/ .......................................................5

Office of National Drug Control Policy, National Drug Control Strategy: Performance Reporting System 2019......................................................8

Opioid Overdose Epidemic, 370 New Eng. J. Med. 2063, 2064 (May 29, 2014) ............................................................................................7

*Overdose Deaths*, RI.gov (Feb. 14, 2018), https://www.ri.gov/press/view/32505................................................................7

Patricia Anne Coyne-Fague, Testimony to Rhode Island State Legislature (March 5, 2019) ............................................................................41

Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Justice 441 (2006) ......................................................................................22

Rahul Gupta, et al., *Transforming Management of Opioid Use Disorder with Universal Treatment,* New England Journal of Medicine 387(15): 1341-1344 (Oct. 2022)..........................................................4

Report, Committee on the Affairs of the State Prison (Jan. 1843)..........................16

Rhode Island Department of Corrections, Budget Report for Fiscal Year 2023 ..............................................................................................18, 41

Rhode Island Department of Corrections, *Replace And Renovate High Security Facility Options* (2019) ............................................................17, 18

Rhode Island Governor's Overdose Intervention and Prevention Task Force, *Rhode Island's Strategic Plan on Addiction and Overdose: Four Strategies to Alter the Course of an Epidemic* (Nov. 4, 2015)....................5

*Rhode Island Prisons Push To Get Inmates The Best Treatment For Opioid Addiction*, NPR (Nov. 19, 2018) ............................................................7

Rhode Island State Legislature, House Resolution H8206 (June 16, 2016) ...................................................................................................19

Rick Raemisch, Remarks at the Vera Institute of Justice, *Webinar: Rethinking Restrictive Housing: What's Worked in Colorado?* (Sept. 17, 2018)..............................................................................................19

Rosemarie A. Martin et al, *Post-release treatment uptake among participants of the Rhode Island Department of Corrections comprehensive medication assisted treatment program,* 128 Preventative Med. 105766 (2019) ...........................................................8, 40, 41

State of Rhode Island Department of Health, *Opioid Use Disorder and Overdose* ....................................................................................5, 7

State of Rhode Island Press Release, *Fentanyl-Contaminated Drugs Continue to Accelerate Rhode Island's Overdose Crisis*, RI.gov (Mar. 30, 2021) ..............................................................................................5

Substance Abuse and Mental Health Services Administration, *TIP 63: Medications for Opioid Use Disorder: For Healthcare and Addiction Professionals, Policymakers, Patients, and Families* (2021)..........................................................................................................8

Terry Kupers, *Solitary: The Inside Story of Supermax Isolation & How We Can Abolish It* 25 (2017)....................................................17

Terry Kupers, *Alternatives to Long-Term Solitary Confinement,* 3 Correctional L. Rep. 33 (2016)..............................................................19

Timothy Williams, *Prison Officials Join Movement to Curb Solitary Confinement*, The New York Times (Sept. 2, 2015)............................18

United Nations, *Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268 (Aug. 5, 2011) .............................................22

World Health Org., *Guidelines for the Psychosocially Assisted Pharmacological Treatment of Opioid Dependence* (2009) ...............................8

## JURISDICTIONAL STATEMENT

Plaintiff-Appellee Jerry Cintron brought this action under 42 U.S.C. §1983 and state law. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1367. After, the district court entered an order denying in part Defendants motion for a judgment on the pleadings, Defendants filed a notice of interlocutory appeal. Although this Court has interlocutory appellate jurisdiction to review the district court's denial of qualified immunity as to Cintron's federal claims, it lacks interlocutory appellate jurisdiction over his state-law claim for abuse of process. *See infra* 54.

## STATEMENT OF THE ISSUES

1.  Whether Cintron plausibly stated a claim under the Eighth Amendment, where Defendants consigned Cintron to years on end of solitary confinement, causing his mind to deteriorate and his body to wither; steadfastly refused to provide mental health treatment for an opioid use disorder that was exacerbated by prolonged solitary; and disregarded the devastating impacts on Cintron's physical and psychological health.

2.  Whether Defendants are entitled to qualified immunity at the pleading stage notwithstanding clearly established Eighth Amendment law prohibiting Defendants' alleged misconduct.

1

3.      Whether Cintron's injunctive relief claim, to which qualified immunity is not a defense, is moot, where Defendants continue to hold Cintron in solitary confinement.

4.      Whether this Court has interlocutory jurisdiction to review Cintron's abuse-of-process claim, a Rhode Island tort that is not subject to a defense of qualified immunity.[1]

## INTRODUCTION

Jerry Cintron spent two and a half years in a room no bigger than a parking spot as punishment for a disease that affects millions of Americans: opioid use disorder (OUD). A.14 ¶1, A.72 ¶72, A.37, A.302, A.305-06. An overdose on fentanyl landed him in solitary confinement for 450 days; the stress of solitary has led to additional relapses and other disciplinary tickets (ranging from arguing with a guard to asking for an extra piece of fruit), resulting in additional solitary. A.37, A.302. All along, Cintron has begged to be treated for his disorder. Specifically, he has asked to be enrolled in the Rhode Island Department of Corrections (RIDOC) Medication Assisted Treatment (MAT) program, which has been proven to reduce opioid dependence and death from overdose. Yet Defendants refused to provide him with this care.

---

[1] In addition, the district court denied Defendants' motion as to two First Amendment claims. On May 4, 2023, Defendants filed an assented-to motion to dismiss those claims, which are therefore no longer at issue on appeal. ECF 66.

2

Instead, they kept Cintron in conditions that deepened his substance use disorder and caused him to deteriorate mentally and physically. The lights glared overhead 24 hours a day, and loud bangs kept him awake all night. A.25 ¶65. He was only let out of his cell for between 45 and 60 minutes on weekdays (to exercise alone in another enclosure), and he was cut off from his children, wife, and other loved ones. A.24 ¶62. Years of isolation led to mental illness, including anxiety and depression; self-harm, including pulling out his hair and badly injuring his hand by bashing it against the wall; and weight loss of almost 70 pounds. This deterioration was exactly what Defendants intended, having told him that they would "bury [him] alive" and keep him in solitary until he was no longer "normal." A.21 ¶41.

Often shorthanded as "solitary confinement," such conditions—23 to 24 hours per day in a cell without meaningful social interaction—have been understood for centuries as a form of torture. Louis P. Masur, Rites of Execution 82-83 (1989). Jurists warn that "[y]ears on end of near-total isolation exact a terrible price." *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring). These concerns are heightened when the person subjected to solitary suffers from mental illness, as does Cintron. Indeed, the isolation of solitary confinement, RIDOC's continuous refusal to provide Cintron with MAT, and Cintron's mental illness were a toxic brew that ravaged Cintron's body and mind.

Against this backdrop, the district court was correct in ruling that Cintron "state[d] an actionable claim for a violation of [his] Eighth Amendment rights." A.469. What's more, because the rights at issue are clearly established, Defendants cannot find refuge in qualified immunity. This Court should affirm the district court as to Cintron's Eighth Amendment claim and dismiss the appeal as to all other claims.

## STATEMENT OF THE CASE

### I.    Factual Background[2]

### A.    Cintron, Who Suffers From Opioid Use Disorder, Is Denied Addiction Treatment In The RIDOC And Nearly Dies From Overdosing.

The opioid epidemic is an American plague. Eight million Americans are currently addicted to opioids, and more than a million have died from overdose since 1996.[3] In 2017—the year after Cintron was imprisoned for non-violent drug

---

[2] Because Defendants' factual background is incomplete and inaccurate, Cintron provides a comprehensive statement of the case.

[3] David. H. Freedman, How the Opioid Backlash Went Wrong, Newsweek (05/03/23), https://www.newsweek.com/2023/05/12/opioid-backlash-addiction-soars-patients-pain-cant-get-their-meds-1797926.html); Jennifer Latson, *Can America Recover from Addiction? With Opioid Overdoses Still on the Rise, It's Hard to See the Path to Healing*, Boston Globe (Aug. 14, 2022), https://www.bostonglobe.com/2022/08/11/arts/can-america-recover-addiction/; Gupta R, et al., *Transforming Management of Opioid Use Disorder with Universal Treatment*, N. Engl. J. Med. 2022 Oct 13;387(15):1341-1344. https://www.nejm.org/doi/full/10.1056/NEJMp2210121.

4

possession—then-President Trump declared it a public-health crisis and devoted funds to helping people like Cintron recover. *See* A.195.[4]

Rhode Island, where Cintron is incarcerated, has been one of the states hardest-hit by the opioid epidemic.[5] In 2013, the state had the highest rate of drug use in the nation, with overdose claiming more lives than motor vehicle accidents, suicides, and homicides combined.[6] Today, opioid overdose is the leading cause of accidental death in the state.[7] The vast majority of overdoses in Rhode Island—almost 75% in 2020—are from fentanyl.[8]

So when Cintron, who struggles with OUD, overdosed after taking half a pill laced with fentanyl on July 12, 2019, A.18 ¶¶18-19, he was just one of hundreds of Americans to overdose on fentanyl that day.[9] And, like most of those people, his

---

[4] *See* Kyle Spencer, *Opioids on the Quad*, N.Y. Times (Oct. 30, 2017), https://www.nytimes.com/2017/10/30/education/edlife/opioids-college-recovery-addiction.html.

[5] Rhode Island Governor's Overdose Intervention and Prevention Task Force, *Rhode Island's Strategic Plan on Addiction and Overdose: Four Strategies to Alter the Course of an Epidemic* 3 (Nov. 4, 2015), https://health.ri.gov/news/temp/RhodeIslandsStrategicPlanOnAddictionAndOverd ose.pdf (hereinafter "Rhode Island's Strategic Plan").

[6] *Id*.

[7] State of Rhode Island Dep't of Health, *Opioid Use Disorder and Overdose*, https://health.ri.gov/healthrisks/drugoverdose/.

[8] Press Release, *Fentanyl-Contaminated Drugs Continue to Accelerate Rhode Island's Overdose Crisis*, RI.gov (Mar. 30, 2021), https://www.ri.gov/press/view/40779.

[9] *See* NEMSIS, *Nonfatal Overdose Surveillance Dashboard*, https://nemsis.org/opioid-overdose-tracker/.

OUD made it very difficult for him to avoid relapse without proper treatment.[10]

That's because OUD is "chronic disease"[11] that is classified as a mental illness by

the American Psychiatric Association[12] and "involves cycles of relapse and

remission."[13] As one recovery specialist put it: "Having a substance use disorder is

like having diabetes."[14] Not offering treatment to someone suffering from OUD,

therefore, "is like not offering insulin to someone with diabetes."[15] Without

treatment, OUD "may result in disability or premature death."[16] Treatment is

especially crucial in a place where opioids are prevalent, like prison.[17]

Yet RIDOC has never treated Cintron for his disorder—despite Cintron's

repeated requests for MAT, both prior to and since his overdose. A.26 ¶73.[18] The

---

[10] *See* Laura Amato et al., *Psychosocial combined with agonist maintenance treatments versus agonist maintenance treatments alone for treatment of opioid dependence*, Cochrane Database Systemic Rev. 5 (2011); *see also* A.26 ¶¶72-73, A.304.

[11] Gov. Gina Raimondo's Executive Order 17-07, *Taking Further Actions to Address the Opioid Crisis* (July 12, 2017), https://governor.ri.gov/executive-orders/executive-order-17-07.

[12] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 541 (5th ed. 2013).

[13] *Pesce v. Coppinger*, 355 F. Supp.3d 35, 40 (D. Mass. 2018).

[14] Spencer, *supra* note 4.

[15] Associated Press, *A peek into opioid users' brains as they try to quit*, NBC News (July 9, 2019), https://www.nbcnews.com/health/health-news/peek-opioid-users-brains-they-try-quit-n1027911 (internal quotations omitted).

[16] *Pesce*, 355 F. Supp.3d at 40.

[17] Rhode Island's Strategic Plan, *supra* note 5, at 8-9.

[18] RIDOC has been touting its Medication Assisted Treatment Program to the national media, yet denied this treatment to Cintron. *See* Christine Vestal, *This State Has Figured Out How to Treat Drug-Addicted Inmates*, Pew (Feb. 26, 2020),

Governor has said MAT, which treats incarcerated people with FDA-approved medications, "is linked to a 61[%] drop in post-incarceration overdose deaths."[19] Studies confirm this reduction, as well as reductions in infectious-disease transmission and even criminal activity.[20] The Rhode Island Department of Health,[21] the FDA,[22] the CDC,[23] the National Institute on Drug Abuse,[24] the Office of National

---

https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/02/26/this-state-has-figured-out-how-to-treat-drug-addicted-inmates (hereinafter "Pew"); Ari Shapiro, *Rhode Island Prisons Push To Get Inmates The Best Treatment For Opioid Addiction*, NPR (Nov. 19, 2018), https://www.npr.org/transcripts/668340844 (hereinafter "NPR")

[19] Press Release, *Raimondo Administration's Addiction Treatment Program for Inmates Linked to 61 Percent Reduction in Overdose Deaths*, RI.gov (Feb. 14, 2018), https://www.ri.gov/press/view/32505.

[20] Nora D. Volkow et al., Medication-Assisted Therapies — Tackling the Opioid Overdose Epidemic, 370 New Eng. J. Med. 2063, 2064 (May 29, 2014), https://www.nejm.org/doi/pdf/10.1056/NEJMp1402780; National Institute on Drug Abuse, Effective Treatments for Opioid Addiction, https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction (last updated Nov. 2016); Amato, *supra* note 10, at 2.

[21] State of Rhode Island Dep't of Health, *Opioid Use Disorder and Overdose*, https://health.ri.gov/healthrisks/drugoverdose/ (directing individuals with OUD to a buprenorphine hotline and other treatment resources, including medication-assisted treatment).

[22] News Release, FDA, *FDA takes new steps to encourage the development of novel medicines for the treatment of opioid use disorder* (Aug. 6, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm615892.htm.

[23] CDC, *Treat Opioid Use Disorder* (last reviewed Nov. 19, 2020), https://www.cdc.gov/opioids/overdoseprevention/treatment.html.

[24] Nora D. Volkow, M.D., National Institute on Drug Abuse, What Science tells us About Opioid Abuse and Addiction, Presentation to Senate Judiciary Committee (Jan. 27, 2016), https://archives.nida.nih.gov/about-nida/legislative-activities/testimony-to-congress/2016/what-science-tells-us-about-opioid-abuse-and-addiction.

Drug Control Policy,[25] the Substance Abuse and Mental Health Services Administration,[26] and the World Health Organization[27] consider MAT essential—it is the "standard of care" for OUD.[28] As Defendant Coyne-Fague has said: "[MAT] saves people's lives."[29] According to then-RIDOC medical director Dr. Jennifer Clarke: "Not providing access to MAT medications denies patients appropriate medical care."[30]

Without MAT, Cintron relapsed and overdosed. A.18 ¶18, A.304. He was found unconscious in his cell and taken to the hospital. A.18 ¶19. He only survived due to multiple doses of Narcan. *Id.*[31]

---

[25] Office of National Drug Control Policy, National Drug Control Strategy: Performance Reporting System 2019, at 11, https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/2019-PRS_final.pdf.

[26] SAMHSA, *TIP 63: Medications for Opioid Use Disorder: For Healthcare and Addiction Professionals, Policymakers, Patients, and Families* 1-3 (2021), https://store.samhsa.gov/sites/default/files/pep21-02-01-002.pdf.

[27] World Health Org., *Guidelines for the Psychosocially Assisted Pharmacological Treatment of Opioid Dependence*, at x-xi (2009).

[28] *Pesce*, 355 F. Supp.3d at 40.

[29] NPR, *supra* note 18.

[30] Rosemarie A. Martin et al., *Post-release treatment uptake among participants of the Rhode Island Department of Corrections comprehensive medication assisted treatment program*, 128 Preventative Med. 105766 (2019), https://pubmed.ncbi.nlm.nih.gov/31279770/.

[31] CDC, *Lifesaving Naloxone* (last reviewed Apr. 21, 2023), https://www.cdc.gov/stopoverdose/naloxone/index.html.

**B.    Defendants Threaten Cintron With Solitary Confinement To Coerce Him To Snitch.**

As Cintron regained consciousness, Defendant Paul Bibeault, an Investigator with RIDOC's Special Investigations Unit, interrogated him. A.18-19 ¶¶19-23. Bibeault demanded that Cintron disclose what he had taken and where he got it. *Id*. ¶20. Cintron admitted to having taken narcotics but, since he was only semi-conscious, could not respond in a coherent manner. *Id*.

When Cintron was discharged from the hospital, Bibeault reiterated his demand, but Cintron replied that he would not provide further information. A.19 ¶¶23, 26. He worried that telling Bibeault who gave it to him, or anything else, would be tantamount to snitching—a life-threatening act behind prison walls.[32] A.14 ¶2, A. 331-32. And, in any event, Cintron heard about the pill for the first time when it was offered, and had no involvement in bringing it into the facility.[33] A.19 ¶25.

---

[32] *See, e.g.*, Jacob Gershman, *Why Life for 'Snitches' has Never Been More Dangerous*, Wall St. J. (June 20, 2017), https://www.wsj.com/articles/criminals-subvert-online-court-records-to-expose-snitches-1497960000; George T. Wilkerson, *It's Surprisingly Tough to Avoid Snitching in Prison*, Marshall Project (July 19, 2018), https://www.themarshallproject.org/2018/07/19/it-s-surprisingly-tough-to-avoid-snitching-in-prison.

[33] Cintron has consistently maintained that he did not bring the pill into the facility, and that Defendants issued him a trafficking ticket in retaliation for his refusal to cooperate in the investigation. A.21 ¶¶40, 42. Just after Cintron added Bibeault as a defendant in this lawsuit, Bibeault claimed an anonymous witness had changed a year-old statement to now implicate Cintron in trafficking. Based on this, Bibeault caused Cintron to be charged criminally. A.30 ¶¶94-97; A.303. This strongly supports Cintron's allegation that the charges were initiated in retaliation. A.33 ¶120. Cintron's nolo contendere plea to the criminal charges does not mean otherwise, as

Cintron's decision infuriated Defendants. *See* A.19-22. During one of four interrogations, Bibeault and Defendant Steve Cabral threatened to charge him with trafficking—which carried a much longer solitary sentence than possession—if he did not snitch. A.21 ¶¶39-40, 43, A.387, A.390. "We'll see if you're still normal when you get out of seg[regation], kid," Bibeault told Cintron. A.21 ¶¶40-42. "You're fucking buried alive," he added, "I'm going to bury you alive." *Id* ¶41. When Cintron asked what basis Bibeault had to charge him with trafficking, Bibeault simply replied that it was for "being a hard-ass" (i.e., refusing to cooperate). *Id.* ¶42. Cintron was terrified and reported these threats to Defendant Rui Diniz, Warden of Medium Security, hoping that Diniz would stop Bibeault from falsely writing him a trafficking ticket. *Id.* ¶43. Instead, Diniz told Cintron that he did not care, and added that he would personally make sure Cintron got the maximum sanction. *Id.*

### C.    Cintron Is "Buried Alive" In Solitary Confinement.

Defendants did exactly what they threatened to do. Relying on an ever-shifting theory of their case,[34] Defendants sentenced Cintron to multiple, escalating,

---

"a significant number of defendants . . . plead guilty to crimes they never actually committed." Jed Rakoff, *Why Innocent People Plead Guilty*, New York Review of Books (Nov. 20, 2014). This is because of the lopsided power dynamic at the plea-bargaining phase of a proceeding. *Id*. That dynamic was certainly present here; in exchange for pleading nolo contendere, Cintron got no additional time on his sentence and no change in his parole eligibility. A.303

[34] Defendants have been inconsistent about whether Cintron bought the pill from an incarcerated person, received it for free, or trafficked it. *See* A.52-54, A.56, A.164, A.297. They have been inconsistent about *what* exactly Cintron allegedly trafficked;

10

consecutive terms of solitary confinement for the same incident. A.21 ¶43.[35] He was initially confined to solitary for 450 days; additional bookings lengthened his time there. A.37; A.302. Some of those additional bookings were for relapse and substance abuse, reflecting Defendants' denial of treatment for Cintron's disease and his deepening addiction as a result of solitary. A.26 ¶74, A.83, A.159. Others were for stress-induced behaviors common among people in solitary, like arguing with a guard or punching a wall. Still others were for innocuous interactions with guards, like requesting an extra orange or asking a guard to take his laundry.

### 1.    Deprived Of Virtually All Human Contact, Cintron Deteriorates.

"[T]raumatic."[36] A "penal tomb."[37]  A "regime that will bring you to the edge of madness, perhaps to madness itself."[38] This is how Supreme Court justices have described modern solitary confinement.

---

sometimes they say it was the fentanyl he overdosed on (A.53-55), and elsewhere that it was "molly" or a different powder (ECF 50 at 72). They have been inconsistent about what their anonymous witnesses have said. A.30 ¶94-97; A.303. And although Defendants initially focused their investigation on someone named Davonte Neves, they doubled-down their efforts to implicate Cintron after Neves died. A.30-31 ¶95.

[35] The initial 450 days was the result of four separate but related bookings from the overdose: 1) being under the influence of unauthorized drugs; 2) possessing homemade or purchased intoxicants; 3) trafficking and 4) circumventing phone security (which was related to the trafficking charge). A37.

[36] *Ruiz v. Texas*, 137 S. Ct. 1246, 1246 (2017) (Breyer, J., dissenting).

[37] *Apodaca v. Raemisch*, 139 S. Ct. 5, 10 (2018) (Sotomayor, J., concurring).

[38] *Davis v. Ayala*, 576 U.S. 257, 288 (2015) (Kennedy, J., concurring).

Solitary confinement is the "practice of keeping [a person] alone in a cell, in conditions designed to sharply curtail human interaction, for twenty-two to twenty-four hours a day on average."[39] Under the "usual pattern" of solitary confinement, these cells are "no larger than a typical parking spot." *Ayala*, 576 U.S. at 286-87; *see also Apodaca*, 139 S. Ct. at 6. "A light remains on in the cell at all times." *Wilkinson*, 545 U.S. at 214. These tiny, harshly lit cells are typically "windowless." *Ayala*, 576 U.S. at 286-87.

"[D]aily existence [in solitary confinement] is one of extreme isolation." *Apodaca*, 139 S. Ct. at 6. People confined in solitary "are deprived of almost any environmental or sensory stimuli and of almost all human contact," "even to the point that conversation is not permitted from cell to cell." *Wilkinson*, 545 U.S. at 214, 223-24. All meals are "passed through a slot in the cell door," *id.*, and "are taken alone in the [person's] cell instead of in a common eating area." *Wilkinson*, 545 U.S. at 214.

In those moments when people confined in solitary are allowed to leave their cells, they are almost always "shackled at the wrists [and] legs." Daniella Johner, *"One Is the Loneliest Number": A Comparison of Solitary Confinement Practices in the United States and the United Kingdom*, 7 Penn St. J.L. & Int'l Aff.

---

[39] David M. Shapiro, *Solitary Confinement in the Young Republic*, 133 Harv. L. Rev 542, 577 (2019); *see also Wilkinson*, 545 U.S. at 214.

229, 246 (2019). They must exercise alone, in isolated cages, referred to as "dog pens" or "dog runs." Shapiro, *supra* n.39, at 578.

Cintron, who was in Rhode Island's most restrictive form of solitary, endured such conditions for two and a half years. A.306. He lived in an 80-square-foot cell. A.24 ¶62. It contained only a bed and a toilet. A.24-25 ¶¶62-63. At times, a video camera in his cell captured every moment, even his urination and defecation. *Id*. ¶63. The lights were on all night. A.25 ¶65. A loud bang—caused by guards slamming doors during rounds—blasted through the space once or twice an hour, even at night. *Id*. Outside doors were kept open, dropping the temperature in his cell to near freezing in the winter. *Id* ¶64. On weekends and holidays, he spent 24 hours a day in his cell. A.24 ¶62. On weekdays, he was permitted to leave for up to an hour— frequently less—to exercise in another cage. *Id*. Cintron's time in solitary cut him off from his family. A.25 ¶70. He was allowed a maximum of one 10-minute phone call each month, so he was rarely able to speak with his wife and children. A.24-25 ¶¶62, 70. He did not see his family for years. A.25 ¶70.

Cintron was also isolated from the outside world writ large. He had no radio, TV, or MP3 player. A.24 ¶62. Sometimes he had no access to any newspapers. *Id* ¶63. He had no access to education or programming. *Id*. ¶62.

His years living in these conditions took a heavy toll—including by worsening the substance use disorder that landed him in solitary in the first place. A.26 ¶74.

13

Due to the stress of extended solitary, Cintron abused his prescription pain medication, accumulating additional bookings that extended his isolation. *Id*. He also began taking sleep medication (for the first time in his life) and antidepressants. A. 25 ¶68. He cried often, and had severe anxiety. *Id*. ¶69. He had intrusive thoughts, negative and disturbing ideas and images that he could not control. *Id*. He began engaging in self-injurious behavior. *Id*. ¶67. For example, he badly injured his hand from punching the walls of his cell and pulled out his hair. *Id*. And he lost almost 70 pounds. *Id*.

As Cintron deteriorated, he alerted Defendants to his worsening health, and begged for help. On July 26—after just nine days in solitary—Cintron was already feeling the destructive effects of solitary, and told hearing officers considering whether to extend his stint in solitary that he would have a difficult time spending just 30 more days there. A.20 ¶33. Cintron repeatedly asked Defendants for mental health services before he finally saw a social worker. A.28 ¶85. He wrote multiple letters to Defendant Jeffrey Aceto, the former Warden of High Security, telling him about his mental health breakdowns and begging for release from solitary, but Aceto refused. *Id*. ¶86. Cintron's social worker told Cintron he spoke with Aceto and Defendant Lynne Corry, then-Warden of High Security, about Cintron's deteriorating health, but both again refused to move him. *Id*. ¶87. When Corry became the Warden of High Security, Cintron wrote yet again asking her to suspend

14

the remainder of his time in solitary confinement because of its impact on his health. *Id*. ¶88. She responded: "I understand that you are going through things at this time however the way to suspend your discipline time is as easy as stop being disciplined. This is a difficult time for all, and sacrifices must be made for the greater health of all around us." *Id*. By March 2020, Cintron, desperate, turned to the courts, filing a motion with the district court to be "let . . . out of seg[regation]" because "[his] mental health is really bad." ECF21.

### 2.　Prison Officials Have Long Known That Solitary Confinement Is Destructive.

Cintron's deterioration comes as no surprise. In the late 18th century, when early Americans first experimented with solitary confinement—at the time, imposed for no longer than six *days*—the punishment was deemed "cruel," "destructive," "ineffective" and "more than human nature can bear." Shapiro, *supra* n.39 at 549-50 (2019). Despite these poor results, some states began instituting longer term isolation in the early 19th century. G. de Beaumont & A. de Toqueville, *On the Penitentiary System in the United States, and Its Application in France* 5 (Francis Lieber ed. & trans., Philadelphia, Carey, Lea & Blanchard 1833); John F. Stinneford, *Experimental Punishments*, 95 Notre Dame L. Rev. 39, 40 (2019). People subjected to it "quickly fell into poor health," suffering from "hallucinat[ions]," "dementia," and a variety of other ills. Stinneford, *Punishments*, 95 Notre Dame L. Rev. at 62-63. Death rates in solitary facilities skyrocketed. *Id.* at 63. The Supreme Court

15

summarized the impacts of the failed American solitary confinement experiment: "[A] considerable number of the prisoners [confined in solitary] fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still committed suicide, while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." *In Re Medley*, 134 U.S. 160, 168 (1890).

Rhode Island was at the forefront of the push to abolish long-term solitary confinement. Urging the abolition of the practice, the Rhode Island Prison Inspector explained to the state legislature in 1841 that the "effect [of solitary confinement] is to injure strong minds, and to produce imbecility or insanity in those that are weak." Inspector's Report (Oct. 1841); *see also* Report, Committee on the Affairs of the State Prison (Jan. 1843) (on file with the Rhode Island States Archives). In 1843, Rhode Island legislators declared solitary confinement a "cruel and "mistaken system of punishment." *Id.* That year, the legislature passed an act effectively abolishing long-term solitary confinement. *An Act in Amendment of an Act Entitled an Act Concerning Crimes and Punishments* (Jan. 18, 1843) (on file with the Rhode Island State Archives). Within months of its passage, prison administrators noticed a significant improvement in the well-being of people incarcerated in the state. "[D]uring the past year," wrote the lead prison physician, "there has been no case of

16

. . . Insanity in the Prison since the abolishment of solitary confinement." Letter from Richmond Brownell, Physician to S.P., to the Honorable General Assembly, Rhode Island (Oct. 30, 1843) (on file with the Rhode Island State Archives).

In the late 20th century, Rhode Island began to experiment with solitary confinement again when it built a supermax prison. *See* Terry Kupers, *Solitary: The Inside Story of Supermax Isolation & How We Can Abolish It* 25 (2017); Lillian Pickett, Leela Berman, & Deborah Marini, *The Prison Within the Prison: A Look at RI's Supermaximum Prison*, TheIndy.Org (Feb. 2, 2023). As before, prison officials have recognized the experiment's failure. In 2016, one 33-year RIDOC veteran, Roberta Richman, who was warden of the Rhode Island women's prison and ultimately assistant director of rehabilitative services, told the Rhode Island legislature that it was "painfully clear . . . that inmates who are subjected to long-term isolation often suffer irreparable harm." Matthew O'Brian, *Former Rhode Island prison warden fights inmate isolation*, Providence Journal (Apr. 8, 2016).

Internal RIDOC reports confirm what Richman observed. A report commissioned by RIDOC in 2019 asserted that "corrections has come to understand the lasting implications of isolation on an individual's mental health." *Replace And Renovate High Security Facility Options*, at 12. The report acknowledged the scientific consensus linking solitary confinement to "depression, suicide and violent tendencies," and added that "[t]hese outcomes complicate correctional systems

17

missions to improve inmate outcomes and reduce recidivism." *Id*. In testimony before the legislature about the supermax, Defendant-Appellant Coyne-Fague—RIDOC's director—explained that "as corrections has evolved, we know that keeping people in cells 23 hours a day is not really the way to go."[40] RIDOC later (erroneously) represented to the Governor's office that it had implemented the Governor's commission's recommendations, which included limiting solitary confinement to 15 days maximum, with 20 hours out-of-cell time per week—all but admitting that anything longer is harmful. FY23 RIDOC Budget Report at 111. It also acknowledged that RIDOC must modify "its current practices in confinement and treatment of [mentally ill] individuals to meet acceptable, constitutionally appropriate standards"; limiting solitary for people suffering from mental illness was "legally, politically, and morally the right thing to do." *Id*. at 110.

But it is not just the serious harm solitary causes that has prompted the correctional community to turn away from the practice; it also serves no penological purpose. *See* Timothy Williams, *Prison Officials Join Movement to Curb Solitary Confinement*, The New York Times (Sept. 2, 2015). For starters, solitary confinement does not decrease prison violence. Chad S. Briggs et al., *The Effect of Supermaximum Security Prisons on Aggregate Levels of Institutional Violence*, 41

---

[40]    Coyne-Fague    Testimony    on    supermax    at    51:14, https://ritv.devosvideo.com/show?video=127d4c476cf6&apg=283c5ac2 .

Criminology 1341, 1341-42 (2003). In fact, when prisons limit the use of solitary they see a marked decrease in prison violence. *See* Marc A. Levin, Esq., *Testimony Before the U.S. Senate Judiciary Subcommittee on The Constitution*, Civil Rights and Human Rights 3 (Feb. 25, 2014); Rick Raemisch, Remarks at Vera Institute of Justice, *Webinar: Rethinking Restrictive Housing: What's Worked in Colorado?* (Sept. 17, 2018). Solitary confinement is also associated with increased rates of recidivism. *See* Terry Kupers, *Alternatives to Long-Term Solitary Confinement*, 3 Correctional L. Rep. 33, 45 (2016); David Lovell & Clark Johnson, *Felony and Violent Recidivism Among Supermax Prison Inmates in Washington State: A Pilot Study* 13 (2004).

Given this, at least twenty-one states and the federal government have taken steps to abolish or limit its use. Gerald Rich & Eli Hager, *Shifting Away from Solitary*, The Marshall Project (Dec. 23, 2014). Rhode Island is among them. On June 16, 2016, the Rhode Island House of Representatives unanimously passed House Resolution H8206, creating a Special Legislative Commission ("Solitary Commission") to Study and Assess the Use of Solitary Confinement in the RIDOC. A. 27 ¶79. The Commission's report, issued on June 29, 2017, recommended a 15-day maximum sentence for disciplinary confinement and the exclusion of inmates with serious and persistent mental illness from solitary. *Id*. at ¶81. Backers of Rhode Island's push to limit solitary point to data showing that the measure will promote

rehabilitation, reduce violence in prisons, and decrease recidivism. Mulvaney, *Solitary confinement: RI bill would limit its use in prisons*.

### 3.    The Settled Science Of Solitary Confinement

Any limitations that Rhode Island places on the use of solitary confinement will come too late for Cintron. "[N]ear-total isolation" has already "exact[ed] a terrible price." *See Ayala*, 576 U.S. at 289 (Kennedy, J., concurring) (citing Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006)). The immeasurable psychological, physical, and neurological harm inflicted upon him and others who experience solitary is "a largely settled scientific fact." Craig Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 Nw. U.L. Rev. 211, 219 (2020).

Solitary confinement causes depression, anxiety, psychosis, paranoia, memory loss, hallucinations, hypersensitivity to stimuli, panic attacks, PTSD, and suicidal behavior. Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 130-31, 134-35 (collecting studies). It is no wonder, then, that people who were kept in solitary more than four weeks are twenty times more likely to need psychiatric hospitalization than other incarcerated people. Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement Is Cruel and Far Too Usual Punishment*, 90 Ind. L.J. 741, 758 (2015). And people who have experienced solitary confinement are 3.2 times more

20

likely to self-harm than other incarcerated people.[41] Solitary confinement is particularly devastating for people with mental illness; for them, it causes "extreme suffering," "worsen[s] symptoms," and can leave them "unable to function."[42]

The physical harms of solitary confinement are just as profound. Put starkly, solitary confinement "literally lowers the age at which people die." Haney, *The Science of Solitary*, at 231; Mariposa McCall, MD, *Health and Solitary Confinement: Issues and Impact,* Psychiatric Times (March 16, 2022) (solitary associated with 26% increased risk of premature death). People who have experienced solitary have more than double the risk of death during their first year out of prison than others recently released. Andrea Fenster, *New data: Solitary confinement increases risk of premature death after release*, Prison Policy Initiative (October 13, 2020). They are 78% more likely to die from suicide within the first year after and 127% more likely to die of an opioid overdose in the first two weeks after release than returning citizens never placed in solitary. James & Vanko, *Impacts*. It also causes hypertension, heart palpitations, gastrointestinal disorders,

---

[41] Kayla James & Elana Vanko, *The Impacts of Solitary Confinement*, Vera Institute (2021), https://www.vera.org/downloads/publications/the-impacts-of-solitary-confinement.pdf.

[42] National Alliance on Mental Illness, *Solitary Confinement*, https://www.nami.org/Advocacy/Policy-Priorities/Stopping-Harmful-Practices/Solitary-Confinement.

headaches, and other physical injuries. Haney, *Mental Health Issues*, *supra*, at 133,[43] and exacerbates life-threatening health conditions like diabetes, high blood pressure, and heart disease. Jayne Leonard, *What are the effects of solitary confinement on health?*, Medical News Today (Aug. 7, 2020).

There are also serious neurological effects. The brains of people subjected to solitary are fundamentally and permanently altered. *See* Dana G. Smith, *Neuroscientists Make a Case Against Solitary Confinement*, Sci. Am. (Nov. 9, 2018). These changes cause slowed brain activity and poorer performance on intellectual and perceptual-motor tests. James & Vanko, *Impacts.*

These damaging health effects appear after even short stints in solitary confinement—within just days. *Id*.[44] The longer someone is kept in solitary, the more severe their degradation.[45] For someone kept in solitary for years like Cintron, the physical, mental, and neurological harms are immeasurable.

---

[43] *See also* Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 CRIME & JUSTICE 441, 488-90 (2006).

[44] *See also* Grassian, *Psychiatric Effects*, at 331 (noting measurable harm within days of solitary confinement); U.N. Human Rights Council, *U.N. Special Rapporteur, Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, at 9, U.N. Doc. A/66/268 (Aug. 5, 2011) (concluding that "harmful psychological effects of isolation can become irreversible" after only 15 days of solitary confinement).

[45] Keramet Reiter, et al., *Psychological Distress in Solitary Confinement: Symptoms, Severity, and Prevalence in the United States, 2017-2018* 110, American journal of public health 1, 56-62 (2020); James & Vanko, *Impacts*.

22

## II.     Procedural History

In 2019, Cintron filed a *pro se* complaint challenging his prolonged solitary confinement. ECF 1. Cintron then filed an Amended Complaint in July 2020, which survived a motion to dismiss. ECF 31. Finally, in February 2021, Cintron filed the operative Second Amended Complaint, adding state and federal claims of retaliation against him for his filing of this lawsuit. A. 14-34. He sought damages, injunctive and declaratory relief,[46] and other appropriate relief. A. 34.

Defendants then filed a Motion for Judgment on the Pleadings, challenging Cintron's claims on the merits and raising a qualified immunity defense. A. 52-99. The district court granted the motion in part and denied it in part on August 22, 2022. A. 469. Defendants filed a notice of interlocutory appeal.[47] ECF 63.

---

[46] Because Cintron is in solitary confinement at the time of filing and as explained *infra* 53, his injunctive claim is not moot.

[47] Cintron is suing each Defendant in their individual capacity. Each was responsible for putting or keeping Cintron in solitary, despite knowledge of the harm it would or did cause him. Bibeault and Cabral threatened to put Cintron in solitary confinement for 365 days, knowing the effect it would have on him. ECF38 at 8 ¶41. They thereafter wrote him tickets for multiple offenses, confining him to solitary. Diniz said he would personally make sure that Cintron got the maximum sentence and refused to suspend his disciplinary time. *Id*. at 8 ¶43. Kettle refused to mitigate the bookings on appeal. *Id*. at 10 ¶56; 15 ¶83. And when Cintron wrote to Coyne-Fague, Corry, and Aceto about his extended segregation sentence and the harm it was causing him, they refused to reduce it. *Id*. at 9 ¶46; 15 ¶86, ¶88.

## SUMMARY OF ARGUMENT

**I.** Defendants plausibly violated the Eighth Amendment because they were deliberately indifferent to the substantial risk of serious harm posed by prolonged solitary confinement.

**A.** While solitary confinement is not per se unconstitutional, this and other courts have long held that the deterioration Cintron experienced as a consequence of his years in isolation amounts to a sufficiently serious risk of harm to satisfy the objective prong of an Eighth Amendment claim. In solitary, for example, Cintron lost nearly 70 pounds, developed depression and anxiety, and engaged in self-harm. The dangers of isolation do not evaporate upon its cessation—extended solitary confinement also places prisoners at risk of future harm, including premature death. And Cintron's experience in solitary was even more injurious than is the norm for two reasons. First, Cintron suffers from mental illness (OUD, depression, and anxiety), making him more vulnerable to the ravages of isolation. Second, Defendants steadfastly refused to treat Cintron's OUD, a failure that both compounded the harmful impacts of solitary confinement and independently satisfied the objective prong of his claim.

**B.** Cintron has also adequately alleged that Defendants were deliberately indifferent to the suffering they imposed. To start, Defendants purposefully injured Cintron, openly planning to "bury [him] alive" in solitary confinement. But that is

24

not the only sufficient allegation of deliberate indifference. Time and again, Cintron told Defendants that solitary was harming him, yet they did nothing. He repeatedly requested mental health treatment, which RIDOC denied. Defendants did nothing to help as Cintron lost 70 pounds and pulled out his hair. Moreover, not only has RIDOC publicly acknowledged the harms of solitary confinement but it is also obvious that prolonged isolation is injurious. Finally, Cintron has plausibly alleged that his prolonged solitary confinement served no penological purpose, which also evinces deliberate indifference.

**II.** Defendants are not entitled to qualified immunity at the pleading stage for at least six reasons. First, Cintron alleged that Defendants purposefully violated the law when they hatched a plan to "bury [him] alive" until he was no longer "normal." Under such circumstances, qualified immunity is unavailable as a matter of law. Second, multiple, related strands of precedent clearly establish the unlawfulness of imposing prolonged solitary confinement on a prisoner who suffers from mental illness. Third, it has been clear for decades that it is unlawful to inflict conditions on a prisoner that result in extreme weight loss. Fourth, conditions that cause or exacerbate psychological deterioration have long been held to violate the Eighth Amendment. Fifth, denying necessary medical or mental health treatment is a paradigmatic violation of the Eighth Amendment. Sixth, and finally, attempting to destroy a person by burying them alive in solitary confinement so obviously violates

25

the Eighth Amendment that Defendants had adequate notice of the unlawfulness of their conduct even if abundant caselaw had not also made that clear.

**III.** Because Defendants continue to cycle Cintron in and out of solitary confinement, his injunctive relief claim, to which qualified immunity cannot be raised as a defense, is not moot.

**IV.** Cintron's state tort claim for abuse of process is not subject to a defense of qualified immunity and therefore this Court lacks interlocutory jurisdiction to consider it.

## STANDARD OF REVIEW

This Court reviews a decision on a motion for judgment on the pleadings de novo "much like" it would a motion to dismiss. *See Pérez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008). All factual allegations in the complaint are taken as true and viewed most favorably to the non-moving party. *See R.G. Fin. Corp. v. Vergara-Nuñez*, 446 F.3d 178, 182 (1st Cir. 2006). To survive a motion for judgment on the pleadings, a complaint need only "contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plausibility" is "not akin to a 'probability requirement'"; rather, a claim is plausible if there is "more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

**I.    Holding Cintron In Solitary Confinement For Years While Depriving Him Of Necessary Medical Treatment Plausibly Violates The Eighth Amendment.**

When Defendants subjected Cintron to two and a half years of solitary confinement notwithstanding his evident physical and psychological decompensation, they were deliberately indifferent to the harm imposed on Cintron. They were also deliberately indifferent to the superadded harm of denying Cintron necessary health care while he languished in solitary. Cintron adequately alleged that he was subjected to a serious risk of harm (i.e., the "objective" prong) that Defendants knowingly disregarded (i.e., the "subjective" prong). *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

**A.    Cintron's Physical And Psychological Degradation From Solitary Confinement And His Lack of Medical Care Are Serious Harms.**

To satisfy the objective prong, the "deprivation" alleged "must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). It need not be physical; the Eighth Amendment "proscribe[s] more than physically barbarous punishments." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). This Court has long recognized that the Amendment "also protects against deliberate indifference to [someone's] serious mental health and safety needs." *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991). Moreover, a

27

risk of harm is enough to state an Eighth Amendment claim. *Farmer*, 511 U.S. at 845.

While solitary isn't per se unconstitutional, various consequences of isolation have been held for decades to implicate constitutional concerns. Cintron alleges precisely those effects—his years in solitary caused the sort of serious physical and psychological harms that satisfy the objective prong of the Eighth Amendment. He physically wasted away, losing almost 70 pounds. A. 25 ¶67. He began engaging in self-injurious behavior. *Id*. The substance use disorder that landed him in solitary confinement deepened. A. 26 ¶¶72-74. He suffers from insomnia so intense that he requires medication to sleep. A. 25 ¶68. He was prescribed antidepressants. *Id*. He cries often, and has intrusive thoughts and severe anxiety. *Id*. ¶69.

In arguing that the harms Cintron has experienced are not sufficiently serious to violate the Eighth Amendment, Defendants ignore what he actually alleges. They instead focus the bulk of their analysis on his lack of rehabilitative programming and sparse furnishings. *See* Appellants' Br. 36-38. By failing to even mention Cintron's weight loss, self-harm, depression, anxiety, insomnia, and the numerous other harms brought on by solitary confinement, Defendants entirely miss the point of the

28

inquiry: To determine whether these harms are sufficiently serious to state an Eighth Amendment claim.[48] Overwhelming precedent confirms that they are.

To start, Cintron's extreme weight loss is precisely the sort of physical harm that counts as objectively serious harm. Research confirms that, "[u]niformly, unintentional weight loss is associated with increased mortality,"[49] in part because it can cause a host of serious health issues. When people confined to solitary alleged they lost up to 30 pounds, the Fourth Circuit did not question the district court's determination that they had alleged a serious harm. *Thorpe v. Clarke*, 37 F.4th 926, 935 (4th Cir. 2022); *see Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 568 (3d Cir. 2017) (noting that solitary causes "dangerous weight loss"). Similarly, the Eleventh Circuit called it "obvious" that an incarcerated man was at "a substantial risk of serious harm" where he exhibited significant "deterioration and weight loss."

---

[48] Defendants cannot identify a single case supporting the constitutionality of holding Mr. Cintron in solitary even for the one year they wrongly insist is at issue here. They point to a small handful of easily distinguishable cases. In *Harris*, the plaintiff did not challenge the conditions of his confinement; he alleged only that the Eighth Amendment was violated by the disciplinary charges themselves and that "it was unfair for him to receive the discipline imposed," "without explaining why." *Harris v. Perry*, No. CA 15-222-ML, 2015 WL 4879042, *5 (D.R.I. July 15, 2015). And both *Rahman X* and *Jackson* lacked allegations of mental illness, OUD, and additional deprivations present here. *Rahman X v. Morgan*, 300 F.3d 970 (8th Cir. 2002); *Jackson v. Meachum*, 699 F.2d 578, 582 (1st Cir. 1983). Both were also decided before long before courts and scientists began sounding the alarm bells about the harms of solitary.

[49] N. John Bosomworth, MD, *The downside of weight loss*, National Library of Medicine (May 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3352786/.

29

*McElligott v. Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999). The Seventh Circuit found a plausible Eighth Amendment violation where a mentally ill prisoner lost 45 pounds, even though the weight loss may have been due to his own refusal to eat the food provided. *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001). And many more cases hold that significant weight loss because of inadequate nutrition plausibly states an Eighth Amendment claim. *E.g.*, *Phelps v. Kapnolas*, 308 F.3d 180, 186-87 (2d Cir. 2002); *Prude v. Clarke*, 675 F.3d 732, 734 (7th Cir. 2012); *Hazen v. Pasley*, 768 F.2d 226, 228 n.2 (8th Cir. 1985).

Cintron's self-harm, including injury to his hand and pulling out his own hair, also satisfies the objective prong; this Court's sister circuits have found "self-injurious behavior" constitutes serious harm under the Eighth Amendment. *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *11-12 (11th Cir. Apr. 15, 2022); *Clark v. Coupe*, 55 F.4th 167, 180-81 (3d Cir. 2022) (plaintiff's allegations of "increased hallucinations, panic attacks, paranoia, nightmares and self-mutilation" were "sufficient to raise a viable Eighth Amendment claim").

Even the *risk of* harm from solitary confinement is enough to meet the objective prong of an Eighth Amendment violation. The Third and Fourth Circuits, for example, have said that, because solitary poses a sufficient risk of harm to just about everyone, a plaintiff subjected to prolonged solitary confinement is entitled to

30

relief under the Eighth Amendment even if he does not show that he himself suffered any harm or was at any individualized risk of harm. *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020); *Porter v. Clarke*, 923 F.3d 348, 360-61 (4th Cir. 2019). In each case, the court relied on the scientific consensus that prolonged solitary confinement is physically and psychologically toxic. *Porter*, 974 F.3d at 441-43; *Porter*, 923 F.3d at 355-57.

In addition to the physical harms Cintron has already experienced, then, the well-documented risk of additional, serious, physical harms also supports his claim. Courts have recognized that solitary confinement causes a range of physical medical problems—up to and including premature death. *Porter*, 974 F.3d at 442; *Williams*, 848 F.3d at 568. Isolation even causes physical changes to the brain, precipitating a decline in neural activity. *See* Jules Lobel & Huda Akil, *Law & Neuroscience: The Case of Solitary Confinement*, 147 Daedalus 61, 69 (2018). These harms last well past a person's release from solitary. *Id.* Significantly, people who spent time in solitary have a much higher risk of death after release than those never held in solitary—including a 127% higher chance of dying of opioid overdose. James & Vanko, *Impacts*.

Independent of the physical harms Cintron experienced, the psychological harms he alleged are sufficiently serious to satisfy the objective prong of the deliberate indifference inquiry. The Third Circuit reversed the dismissal of a

31

complaint challenging multiple stints of solitary adding up to no more than 13 months (compared to Cintron's 2.5 years) where, like Cintron, the plaintiff experienced depression and self-harming tendencies. *Palakovic v. Wetzel,* 854 F.3d 209 (3rd Cir. 2017); *see also Wallace v. Baldwin*, 895 F.3d 481, 483 (7th Cir. 2018) ("[This] extreme isolation [has] taken a toll on [plaintiff's] mental health."). The court held that "in light of the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health," the plaintiff's "allegations [were] more than sufficient to state a plausible claim that [Plaintiff] experienced inhumane conditions of confinement to which the prison officials . . .were deliberately indifferent" *Palakovic,* 854 F.3d. at 226.

Courts have recognized that solitary confinement is particularly injurious to people with mental illness like Cintron. Cintron alleges that isolation has exacerbated his mental illness, deepening his OUD;[50] causing severe anxiety and depression; and leading him to engage in self-harm, openly weep, and struggle against intrusive thoughts. Cintron is squarely within the special class of people for whom courts have recognized solitary is particularly devastating. *Sanders v. Melvin*, 873 F.3d 957, 960 (7th Cir. 2017) (combination of mental illness and prolonged

---

[50] Confining Cintron to solitary because of opioid use is tantamount to punishing him not just *despite* his known mental illness, but *because of* it. *See Thomas v. Bryant*, 614 F.3d 1288, 1311 (11th Cir. 2010) (pepper-spraying mentally ill incarcerated people whose mental illness caused them to disobey orders constituted disproportionate punishment).

segregation predisposed plaintiff to self-harm); *Palakovic*, 854 F.3d at 225-26 ("[a] robust body of legal and scientific authority recogniz[es] the devastating mental health consequences caused by long-term isolation in solitary confinement").

Cintron's Eighth Amendment claim is strengthened by the well-established risk of the numerous additional serious psychological harms solitary confinement causes. Prisoners exposed to solitary suffer from hallucinations, panic, lethargy, cognitive dysfunction, paranoia, memory loss, stimuli hypersensitivity, and other mental issues. *See* Haney, *Mental Health Issues*, *supra*, at 130-31, 134 (collecting studies); Grassian, *Psychiatric Effects*, *supra*, at 335-36, 349. Life-threatening behavior like suicidal ideation is common among prisoners in solitary. Grassian, *Psychiatric Effects*, *supra*, at 349. These harms are universal: "[T]here is *not a single published study* of solitary or supermax-like confinement" for longer than 10 days that failed to show that isolation has negative psychological effects. *Porter*, 923 F.3d at 356 (quoting Haney, *Mental Health* Issues, *supra,* at 132). "[V]irtually *everyone* exposed to such conditions is affected in some way." *Porter*, 974 F.3d at 442. Like solitary's physical harms, its psychological harms last years after release from solitary. *Porter*, 923 F.3d at 357; Grassian, *Psychiatric Effects*, *supra*, at 353.

In short, the inevitable, grave, and universal risks of solitary confinement have been recognized by jurists around the country and deemed by multiple circuits to

33

suffice, standing alone and without any individualized showing of harm, to satisfy the objective component of the Eighth Amendment.

But Cintron's allegations satisfy the objective prong in another way. Cintron alleged that Defendants stacked an additional, objectively serious deprivation atop the effects of solitary confinement by refusing to provide him health care for OUD. An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005); *see also Perry v. Roy*, 782 F.3d 73, 78-79 (1st Cir. 2015). Cintron's opioid use disorder is both. Opioid addiction is per se a serious medical need because it is a diagnosable condition that requires treatment.[51] Often likened to diabetes or a heart condition, opioid addiction is "a chronic relapsing disease"[52] that presents a notable risk of death. *Pesce*, 355 F. Supp. 3d at 40. And as with insulin or heart medication, RIDOC's policy is to provide MAT to everyone who needs it. *See* Rhode Island's Strategic Plan, *supra* note 5, at 9. RIDOC's provision of care for the disorder necessitates a finding that opioid addiction is, in fact, a serious medical need. In any event, even if opioid addiction were not clearly within the range of

---

[51] National Institute on Drug Abuse, *Effective Treatments for Opioid Addiction*, https://nida.nih.gov/publications/effective-treatments-opioid-addiction (last updated Nov. 2016).

[52] Rhode Island's Strategic Plan, *supra* note 5, at 3.

serious medical needs "diagnosed by a physician mandating treatment," a lay person would nonetheless "easily recognize" the harm posed by the disorder. *Perry*, 782 F.3d at 78-79. Cintron nearly died as a result of his OUD, requiring multiple doses of Narcan to revive him. A.18 ¶¶18-19. Courts around the country have recognized OUD as a serious medical need for purposes of the Eighth Amendment. *See Pesce*, 355 F. Supp. 3d at 40 ("As with other chronic diseases, opioid use disorder involves cycles of relapse and remission. Without treatment or other recovery, opioid use disorder may result in disability or premature death."); *Goldman v. Fed. Bureau of Prisons*, 768 F. App'x 714, 715 (9th Cir. 2019) (vacating dismissal with prejudice of Eighth Amendment claim based on denial of medication for opioid addiction); *Brawner v. Scott Cty.*, 14 F.4th 585, 598 (6th Cir. 2021) (jury could find that pretrial detainee who was taking suboxone for opioid addiction had objectively serious medical need); *Jensen v. Thornell*, No. CV-12-00601-PHX-ROS, 2023 WL 2838040, at *19 (D. Ariz. Apr. 7, 2023) (injunction "requiring that "all prisoners who have a documented history of overdose or who upon assessment are determined to be at imminent risk of an opioid overdose, shall be offered MOUD with buprenorphine or naltrexone" entered to address "egregious constitutional violations").

35

The denial of medical care to Cintron, even if not considered in concert with the harms imposed by solitary confinement, easily satisfies the objective prong of a deliberate indifference claim.

### B.    Defendants Knowingly Disregarded The Risks To Cintron.

To satisfy the subjective prong of the Eighth Amendment, Cintron must allege that Defendants "kn[ew] of and disregard[ed] an excessive risk to [his] health and safety." *Farmer*, 511 U.S. at 837. He needn't allege that correctional officials acted "with knowledge that harm will result." *Id.* at 835. No "smoking gun" is required to prove deliberate indifference. *Moore v. Mabus*, 976 F.2d 268, 271 (5th Cir. 1992). For six separate reasons, Cintron's complaint adequately alleges Defendants' deliberate indifference to the serious risks of both their imposition of prolonged solitary confinement and their decision to deny necessary health care while Cintron was deteriorating in solitary.

*First*, Cintron indeed alleges a "smoking gun" establishing Defendants' knowledge that harm would result: As Bibeault and Cabral threatened to lengthen Cintron's solitary sentence from just a few weeks to over a year, Bibeault told Cintron, "We'll see if you're still normal when you get out of seg[regation], kid. You're fucking buried alive. I'm going to bury you alive." A.21 ¶41.[53] Bibeault's

---

[53] In addition to Bibeault, who made the statements, and Cabral, who participated in the accompanying threats, at least Diniz was also aware of Bibeault's statements when he explained that "he did not care what Cintron had to say" and promised to

equating of solitary confinement to being "buried alive" and his taunts that a year in solitary would ensure Cintron was no longer "normal" leave no doubt that Bibeault was familiar with the serious harm that solitary causes. *See, e.g.*, *Berkshire v. Dahl*, 928 F.3d 520, 527, 535-36 (6th Cir. 2019) (genuine dispute as to deliberate indifference on part of prison psychologists who "admitted that [they] knew that [plaintiff] was suffering from [a major mental disorder]" and yet waited to refer him to a mental health program "because they hoped that [plaintiff] would have died"); *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (plaintiff adequately pleaded deliberate indifference based on correctional officer's statement that "he didn't care" plaintiff had been denied food and water for more than 24 hours); *Olson v. Bloomberg*, 339 F.3d 730, 737-38 (8th Cir. 2003) (reasonable jury could infer deliberate indifference to risk of suicide where correctional officer said, "you do what you got to do," when inmate said he would hang himself); *Olive v. Wexford Corp.*, 494 F. App'x 671, 672 (7th Cir. 2012) (deliberate indifference claim may proceed where plaintiff told physician he couldn't take ibuprofen because it aggravated his peptic ulcer and physician responded "so what?" and prescribed it anyway). Corry acknowledged Cintron's declining health even more directly when she responded to one of his letters, writing: "I understand that you are going through

---

"personally make sure" that Cintron spent the maximum amount of time in solitary. A.21 ¶43.

37

things at this time"; however, "sacrifices must be made for the greater health of all around us." A.28 ¶88.

***Second***, Cintron alleges that he reported his deteriorating health to Defendants again and again, begging for release him from solitary. *See Delaney v. DeTella*, 256 F.3d 679, 686 (7th Cir. 2001) (allegation that plaintiff "repeatedly complained to each of the named defendants, filed a grievance, and requested medical attention frequently," and that "inaction satisfies the subjective element of an Eighth Amendment claim"); *Porter*, 974 F.3d at 445 (plaintiff's "grievance and multiple appeals to the DOC, including to Defendant" were sufficient to demonstrate defendant's subjective awareness of health risks of solitary); *Palakovic*, 854 F.3d at 230-31 (officials had knowledge of risk of suicide in part because plaintiff "told prison officials so"). The first time Cintron told prison officials that he would have a "difficult time" if forced to stay just 30 extra days in solitary, he had only been there for nine days. A.20 ¶¶30, 33. As the months and years dragged on, he wrote multiple letters to Defendants describing his "mental health breakdowns" and repeatedly asked for mental health services. A.28 ¶¶83-88. But Cintron's pleas fell on deaf ears. *Id.* ¶87.

Likewise, Cintron repeatedly asked Defendants to provide him with treatment for OUD, but they refused. A.26 ¶73. This Court has held a jury could find prison medical staff "subjectively knew of [Plaintiff's] serious medical need but

38

deliberately ignored it" where Plaintiff "assert[ed] he specifically told them that his jaw was broken" and asked to be taken to a hospital. *Perry v. Roy*, 782 F.3d 73, 80 (1st Cir. 2015); *see also Lucas v. Chalk*, 785 F. App'x 288, 291-92 (6th Cir. 2019); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) ("[W]e have long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner."). Cintron's case is a clearer cut example of deliberate indifference than *Perry*, because the Plaintiff there "had been provided at least some treatment," unlike Cintron. *Perry*, 782 F.3d at 77; *see also Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (courts need not worry about second guessing medical judgments where there was a "*complete* denial of medical care," as opposed to inadequate care). But even if Defendants had provided some care short of MAT, they would still have been deliberately indifferent, because "medical treatment may so deviate from the applicable standard of care as to evidence . . . deliberate indifference." *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001). Doctors, policymakers, and even RIDOC officials agree that "MAT is the standard of care for treatment of opioid use disorders."[54] *Pesce*, 355 F.

---

[54] FDA, FDA News Release, *FDA takes new steps to encourage the development of novel medicines for the treatment of opioid use disorder* (Aug. 6, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm615892.htm; National Institute on Drug Abuse, *Effective Treatments for Opioid Addiction*, https://nida.nih.gov/publications/effective-treatments-opioid-addiction (last updated Nov. 2016); NIDA, *What Science tells us About Opioid Abuse and Addiction*, Nora

Supp. 3d at 40 (internal quotations omitted); Clarke, *Post-release treatment*, *supra* n.30.

*Third*, Defendants knew of the harm they were causing because it was apparent to any casual observer. Cintron lost 70 pounds, openly struggled with addiction, and was diagnosed with mental illness that required medication. *See McElligott*, 182 F.3d 1at 1256 (extreme weight loss permitted a jury to infer knowledge of a substantial risk of serious harm); *Palakovic*, 854 F.3d at 226 (it was "quite reasonable to infer that prison officials had (or should have had) knowledge" of plaintiff's mental health where "prison diagnosed [plaintiff] with an array of serious mental health issues."); *Clark*, 55 F.4th at 180 ("defendants were 'well aware' that he was seriously mentally ill, given that he had been treated for schizophrenia and bipolar disorder at the prison for over ten years").

*Fourth*, internal RIDOC reports, reports commissioned by RIDOC, the Solitary Commission's report, and public testimony from Defendants confirm that they knew of the risks of solitary confinement. RIDOC acknowledged in a budget submission that its current solitary practices do *not* "meet acceptable, constitutionally appropriate standards," and that, in particular, limitations on solitary for people with mental illness is "legally, politically, and morally the right thing to

---

D. Volkow Testimony to Congress (Jan. 27, 2016); President's Commission, *supra* note 25, at 68.

do." FY23 RIDOC Budget Report at 110. RIDOC also represented—inaccurately, it turns out—that it had limited solitary confinement to 15 days maximum, with 20 hours out-of-cell time per week. *Id*. at 111. Another report asserted that "corrections has come to understand the lasting implications of isolation on an individual's mental health." Replace And Renovate High Security Facility Options, at 12. "[S]tudies have correlated depression, suicide and violent tendencies with restrictive, isolated environments," the report said. "These outcomes complicate correctional systems missions to improve inmate outcomes and reduce recidivism." *Id*. In testimony before the Rhode Island legislature, Coyne-Fague confirmed that "as corrections has evolved, we know that keeping people in cells 23 hours a day is not really the way to go." Coyne-Fague Testimony at 51:14. And at least one federal judge has already held that knowledge of solitary's harms "can plausibly be charged to [RIDOC personnel]" because of Rhode Island's Solitary Commission, which heard public testimony and published a report outlining its findings. *Duponte II v. Wall*, No. 17-397-JJM-LDA, ECF 186 at 17 (D.R.I. Jan. 22, 2018). Similarly, RIDOC personnel and the Rhode Island Governor have routinely discussed the necessity for and effectiveness of MAT to combat OUD. *See* Rhode Island's Strategic Plan, *supra* note 5, at 9; Rosemarie A. Martin, et al., *Post-release treatment uptake among participants of the Rhode Island Department of Corrections comprehensive medication assisted treatment program*, 148 Prev. Med. (Nov.

41

2010).[55] It is RIDOC's standard procedure to "offer treatment with all three FDA approved medications (methadone, buprenorphine, and naltrexone) to all medically eligible incarcerated people."[56] Such statements, reports, and testimony are tantamount to an admission that Defendants knew of the risks of harm posed to Cintron by their actions. *See Porter*, 923 F.3d at 361 (prison procedures "constitute unrebutted evidence of State Defendants' awareness" of harms of solitary); *Hinojosa v. Livingston*, 807 F.3d 657, 666-67 (5th Cir. 2015) (policies "would establish that Defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also dr[ew] the inference.'"); *Clark*, 55 F.4th at 180 (American Correctional Association report condemning practice of placing seriously mentally ill inmates in solitary put prison officials on notice of risk); *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 453 (5th Cir. 2009) (reasonable to infer subjective knowledge for failure to treat claim from "evidence [that] included a comprehensive evaluative report commissioned by the County [and a] DOJ report"); *Perez v. Cox*, 788 F. App'x 438, 441-43 (9th Cir. 2019) ("[b]oth the objective and subjective components [of excessive force claim] are corroborated by the [Association of State Correctional Administrators] report").

---

[55] https://doi.org/10.1016/j.ypmed.2019.105766

[56] Linda Hurley, *Rhode Island Model of MOUD in Corrections Withstands COVID*, American Association for the Treatment of Opioid Dependence, Inc., http://www.aatod.org/rhode-island-model-of-moud-in-corrections-withstands-covid/ (last visited May 4, 2023).

42

*Fifth*, deliberate indifference can be inferred if the risks of harm are "open and obvious." *Hinojosa*, 807 F.3d at 665-66. Correctional officials needn't be aware of a risk as to one particular inmate; awareness that conditions are generally dangerous is sufficient. *Id.* at 667-68. The Fourth Circuit, for instance, concluded that "[g]iven [D]efendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction…could cause[;]" "the extensive scholarly literature" regarding solitary "provides circumstantial evidence that the risk of harm 'was so obvious that it had to have been known.'" *Porter*, 923 F.3d at 361-62. Cintron's extreme weight loss also made it obvious that he was at risk of serious harm. *See Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) ("[Plaintiff] might prove that the Defendants knew of the substantial risk of harm [from a restricted diet] from the very fact that the risk was obvious."); *McElligott*, 182 F.3d at 1256 ("[G]iven the extent of the deterioration and weight loss that [Plaintiff] faced . . . , the risk of harm to [Plaintiff] was obvious, permitting a jury to infer knowledge of a substantial risk of serious harm."). And Cintron's near-fatal overdose made it all too obvious that his life was at risk without the treatment he repeatedly requested.

*Finally*, deliberate indifference can be shown from actions taken without penological purpose. *See Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). Cintron has plausibly alleged that his solitary confinement for OUD and refusal to provide

43

MAT serve no penological purpose. As he continues to cycle in and out of solitary for behaviors related to his OUD, his disorder only got worse; indeed, no amount of solitary confinement can make him less addicted to opioids. *Thomas*, 614 F.3d at 1311 (no penological purpose where measure cannot help people "conform[] [their] conduct to prison regulations"). And whatever security justification initially may have existed disappeared as the months turned to years. *See Mims v. Shapp*, 744 F.2d 946, 953 (3d Cir. 1984) (measures have purpose only when person "continues to pose a safety or security risk"). To the extent Defendants maintain that Cintron's time in solitary was necessary for security reasons, that conflicts with Cintron's allegations that he did not traffic drugs. A.19 ¶25. His allegations must be taken as true at this stage. *R.G. Fin. Corp.*, 446 F.3d at 182.

Cintron more than adequately alleged that Defendants were deliberately indifferent to a substantial risk of serious harm.

## II.    Defendants Are Not Entitled To Qualified Immunity.

Because the constitutional rights here were "clearly established . . . rights of which a reasonable person would have known," the lower court correctly denied qualified immunity. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity analysis turns on "whether the state of the law at the time of the putative violation afforded the

44

defendant fair warning that his or her conduct was unconstitutional." *Limone v. Condon*, 372 F.3d 39, 45 (1st Cir. 2004); *see also Hope*, 536 U.S. at 741 (similar).[57]

"[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. Thus, rights may be clearly established even in the absence of "cases involving 'fundamentally similar' facts" or even "'materially similar' facts." *Id.* In fact, in obvious cases—like this one— the Supreme Court has repeatedly reaffirmed that a plaintiff need not point to *any* prior case to clearly establish the law. *See Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020); *McCoy v. Alamu*, 141 S. Ct. 1364 (2021). This court may also consider non-judicial sources like regulations, reports, legislative testimony, and internal documents. *Eves v. LePage*, 927 F.3d 575, 587 (1st Cir. 2019) (en banc) (considering state statutes); *Hope*, 536 U.S. at 743-44, 744 n.11 (considering prison regulations and DOJ report).

---

[57] Because he adequately alleged a constitutional violation, Cintron satisfied the first prong of the qualified immunity analysis. Part I, *supra*; *Hope*, 536 U.S. at 736. Although courts may skip over deciding whether the asserted right exists in cases where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009), the abundance of case law supporting Cintron's claim shows this is not such a case. In any event, some of this Court's sister circuits have made a practice of addressing both prongs, because they "are mindful that 'it is often appropriate and beneficial to define the scope of a constitutional right' to 'promote[ ] the development of constitutional precedent' before deciding whether the right was clearly established." *Porter*, 974 F.3d at 437. This Court should follow suit.

This makes sense. After all, the clearly established inquiry boils down to notice. In some cases, such as Fourth Amendment probable cause or excessive force cases, a "high 'degree of specificity'" may be necessary to provide the requisite notice. *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). But in conditions cases involving no split-second decisions, no such situational similarity is required to make it over the clearly established hurdle. *See Hope*, 536 U.S. at 745-76. Instead, a "general statement[] of the law" can provide fair warning, as long as it applies with "obvious clarity to the specific conduct in question." *Id*. at 741. Finally, purposeful violations of the law are not shielded by qualified immunity. *Thorpe*, 37 F.4th at 930-31.

Defendants were on notice that their conduct was unconstitutional. Separately, Defendants purposefully violated the law. Qualified immunity is therefore unavailable here for not one, not two, but six separate reasons.[58]

***First***, where a Plaintiff has adequately pleaded Defendants purposefully inflicted harm, the qualified immunity inquiry is simple. A court need not consider

---

[58] Defendants frame the right at issue as whether "a prison official was required to suspend an inmate's disciplinary sentence in circumstances where that inmate committed multiple, serious disciplinary offenses, and after being placed in restrictive housing continued to commit disciplinary offenses and consume illicit substances." Appellants' Br. at 48-49. As laid out in this section, Defendants have violated numerous clearly established rights; that is not one of them. Mr. Cintron does not argue that he should be immune from discipline. He argues that clearly established law gives him the right to must be confined in humane conditions.

whether the specific rights at issue were clearly established; the doctrine will "not allow the official who actually knows that he was violating the law to escape liability for his actions." *Thorpe*, 37 F.4th at 933-34 (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 821 (1982) (Brennan, J., concurring)); *see also Dean v. Jones*, 984 F.3d 295, 310-11 (4th Cir. 2021) (qualified immunity inappropriate where liability turns "on whether the officer acts with a culpable state of mind[;] because an officer necessarily will be familiar with his own mental state, he 'reasonably should know' that he is violating the law if he acts with a prohibited motive"); *Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1119 (9th Cir. 2017) (qualified immunity protects only "mistaken but reasonable decisions"). For example, the Fourth Circuit recently affirmed the denial of qualified immunity "not because [case law] finally acknowledged that long-term segregation can severely harm prisoners"—though it has—"but because Plaintiffs have adequately alleged Defendants knowingly promulgated harmful conditions." *Thorpe*, 37 F.4th 934 n.3. In other words, where Defendants purposefully inflicted harm, the questions whether they acted with deliberate indifference, and whether qualified immunity is available, merge into a single inquiry. *Id.*; *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) ("Because deliberate indifference under *Farmer* requires actual knowledge or awareness on the part of the defendant, a defendant cannot have qualified immunity if she was deliberately indifferent."); *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th

47

Cir. 2002) (where there are genuine issues of fact about defendant's "knowledge of the threat to the plaintiff's health or safety, . . . defendant's failure to take reasonable measures[,] defendant's subjective intent to harm or deliberate indifference. . . . defendant may not avoid trial" relying on qualified immunity). Here, Cintron alleged that Defendants purposefully hurt him, going so far as to tell him they would "bury him alive" in solitary until he was no longer "normal." The premeditated decision to grievously injure Cintron is the very definition of a knowing violation of the Eighth Amendment. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (malicious conduct meant to cause harm violates the Eighth Amendment).  At least at this early stage, such allegations are more than adequate to defeat a claim of qualified immunity.

**Second**, it is clearly established that exposing someone to an outsized risk of harm through solitary confinement is unconstitutional. Multiple, related strands of case law make this clear. For example, by June 2019, when Defendants threw Cintron into solitary, "several courts [had] found . . . that solitary confinement poses an objective risk of serious psychological and emotional harm to inmates, and therefore can violate the Eighth Amendment." *Porter*, 923 F.3d at 357; *see Palakovic*, 854 F.3d at 225-26 ("[A] robust body of legal and scientific authority recogniz[es] the devastating mental health consequences caused by long-term isolation in solitary confinement" and the "physical harm [that] can also result.")*; Davenport v. DeRobertis*, 844 F.2d 1310, 1311-13 (7th Cir. 1988) (noting that

48

"isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage"). This judicial recognition of the harms of solitary confinement goes back decades, in fact, well before RIDOC placed—and kept—Cintron in solitary for years on end. *Medley*, 134 U.S. at 170.

The prolonged-solitary-confinement precedent, standing alone, is enough to deny qualified immunity. But this case involves something altogether more harmful: the long-term solitary confinement of someone suffering from mental illness—in Cintron's case, OUD, depression, and anxiety. The case law also clearly establishes that as unlawful under the Eighth Amendment. *Palakovich*, 854 F.3d at 226 (mentally ill person held in solitary for "multiple 30-day stints" that together amounted to year; allegations were "more than sufficient to state a plausible claim that [plaintiff] experienced inhumane conditions of confinement to which the prison officials . . . were deliberately indifferent"). Defendants nonetheless placed him in solitary knowing full well that he suffered from life-threatening OUD, held him in solitary as his OUD persisted untreated, and even continued his placement in isolation after he developed depression, insomnia, and anxiety severe enough to require medical treatment. That conduct is blatantly incompatible with clearly established law.

As if that were not enough, another strand of case law also put Defendants on notice that it was unlawful to consign someone to solitary for years on end. While

no court has held that solitary is *per se* unconstitutional, courts have routinely held the Eighth Amendment has been violated where someone is held for any period longer than a few months with additional deprivations, such as constant illumination, loud noise, or drastically restricted out-of-cell time. *E.g.*, *Keenan v. Hall*, 83 F.3d 1083, 1089-91 (9th Cir. 1996) (Eighth Amendment claim stated for year in solitary with excessive noise, constant cell illumination); *Walker v. Shansky*, 28 F.3d 666, 668-69, 673 (7th Cir. 1994) (reversing summary judgment, denying qualified immunity on claims related to 10-month solitary confinement with additional deprivations); *Davenport*, 844 F.2d at 1311-13 (90 days of solitary with three hours per week of out-of-cell time stated Eighth Amendment claim). Defendants superadded each of these deprivations atop Cintron's isolation. This decades-old case law put Defendants on notice that Cintron's years under 24-hour-per-day fluorescent lighting, with a constant, loud bang thundering through his cell, and only 3.75 hours of out-of-cell time per week was unconstitutional.

**Third,** it has been clearly established for decades that conditions imposing significant weight loss are unlawful. *E.g.*, *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) (losing weight from "diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months"); *Prude*, 675 F.3d at 734 (conditions "with the effect of causing substantial weight loss . . . would violate" Eighth Amendment). It doesn't matter whether the condition is solitary confinement, an inadequate diet,

or something else; the right to be free of conditions that cause unwanted, dangerous weight loss is long-established.

*Fourth*, case law long ago established that imposing conditions (solitary or otherwise) that cause or exacerbate psychological deterioration, including mental illness, self-harm, and insomnia, violate the Eighth Amendment. *Palakovic*, 854 F.3d at 226 ("the increasingly obvious reality [is] that extended stays in solitary confinement can cause serious damage to mental health"); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) ("[D]enial of treatment for . . . compulsion to mutilate [one]self constitute[d] deliberate indifference."); *Keenan*, 83 F.3d at 1090-91 (constant exposure to bright lights can establish Eighth Amendment deprivation); *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("sleep is critical to human existence[;] conditions that prevent sleep" are unconstitutional); *Johnson v. Levine*, 588 F.2d 1378, 1380 (4th Cir. 1978) (overcrowding resulting in "psychological injury to some prisoners" states claim). These and other cases put Defendants on notice that they acted unlawfully. In solitary, Cintron experienced depression, anxiety, and intrusive thoughts; suffered from insomnia; and engaged in self-harming behavior.

*Fifth*, "[i]t was clearly established in 1986 that [officials] could not be deliberately indifferent to a detainee who is in need of medical attention because of a mental illness" without violating the Eighth Amendment. *Sanville*, 266 F.3d at

51

740-41; *Estelle*, 429 U.S. at 103-04; *see also Perry*, 782 F.3d at 78-79; *Greeno v. Dailey*, 414 F.3d 645, 655 (7th Cir. 2005); *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). RIDOC recognizes OUD as a serious, often deadly illness and provides people suffering from this illness with a medical treatment that it touts as reducing death rates by 61%. Press Release, *Raimondo Administration's Addiction Treatment Program, supra*. Yet they refused to give Cintron this medical treatment, despite his numerous pleas. Defendants had ample notice that this denial of care was unconstitutional.

*Sixth*, and finally, the Supreme Court has long held that in "obvious" cases, general principles of constitutional law can provide fair warning to officials that their acts are unlawful. *See, e.g.*, *Hope*, 536 U.S. at 741-46. The Supreme Court has twice reiterated this principle in the last few years. *See Taylor*, 141 S. Ct. at 53-54; *McCoy*, 141 S. Ct. at 1364. Relegating someone with OUD to solitary for years, even as he lost 70 pounds, developed mental illness and otherwise decompensated, and denying him medical care is so obviously unlawful that corrections officers need not have opened a casebook to know their conduct was prohibited. *See Taylor*, 141 S. Ct. at 53. Indeed, "it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082-83 (10th Cir. 2015) (Gorsuch, J.).

52

Defendants' conduct was blatantly unlawful, in many respects; qualified immunity provides them no refuge.

### III.    Cintron's Injunctive Claim Is Not Moot.

Defendants incorrectly argue that Cintron's injunctive claims, to which qualified immunity is no bar, are moot because, they say, he is no longer in solitary. Appellants' Br. 53. When he was briefly in general population in 2022, he acknowledged in a filing that he was not, at that moment, in solitary and called his injunctive claim moot. A.316. But he is now back in the most restrictive form of solitary confinement on a booking directly resulting from his untreated OUD—a continuation of the unconstitutional conditions he sued to end. *See Palakovic*, 854 F.3d at 217 (treating multiple stints in isolation in succession as all part of one claim). An action is not moot when a defendant voluntarily ceases its unlawful conduct unless it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190 (2000). Defendants bear the "formidable burden" of showing that the unconstitutional treatment will not resume. *Id.; see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 288-89 (1982) (heavy burden not met even by change in law; "revision of the ordinance" to excise unconstitutional language did not moot challenge because "repeal of the objectionable language would not

preclude it from reenacting precisely the same provision" later). Defendants cannot meet this burden, given that the conduct has already resumed.

## IV.   This Court Lacks Interlocutory Jurisdiction Over Cintron's Abuse-Of-Process Claim.

This Court lacks jurisdiction to consider the state abuse-of-process tort against Defendant Bibeault.

First, the district court did not deny qualified immunity on the tort, so there is no appealable order on this issue. Interlocutory review is a narrow exception to the final judgment rule, and the availability of qualified immunity is a condition precedent. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Second, Defendants did not claim qualified immunity from the abuse-of-process count. Accordingly, they have forfeited the defense. Lastly, the state waived immunity for Bibeault's actions under Rhode Island's Tort Liability Act, R.I. Gen. Laws § 9-31, a "blanket waiver of the state's sovereign immunity" for tort claims, *Longtin v. D'Ambra Constr. Co.*, 588 A.2d 1044, 1045 (R.I. 1991). No one alleged Bibeault's actions fell under any exception to this act.

54

## CONCLUSION

For the aforementioned reasons, this Court should affirm the judgment of the district court.

Date: May 11, 2023                    Respectfully submitted,

                                      /s/ *Kathrina Szymborski Wolfkot*

Natalia Friedlander                   Daniel M. Greenfield*
Jennifer L. Wood                      Kathrina Szymborski Wolfkot**†
RHODE ISLAND CENTER FOR JUSTICE       Felipe Hernandez***
One Empire Plaza, Ste. 410            Benjamin Gunning
Providence, RI 02903                  RODERICK & SOLANGE
(401) 491-1101                          MACARTHUR JUSTICE CENTER
nfriedlander@centerforjustice.org     501 H St. NE, Ste. 275
jwood@centerforjustice.org            Washington, DC 20002
                                      (202) 869-3450
                                      kathrina.wolfkot@macarthurjustice.org

*Admitted only in Illinois, admission to D.C. pending.
**Admitted only in New York; not admitted in D.C. Practicing under the supervision of the Roderick & Solange MacArthur Justice Center.
***Admitted only in California; not admitted in D.C. Practicing under the supervision of the Roderick & Solange MacArthur Justice Center.

*Counsel for Plaintiff-Appellee Jerry Cintron*

†UCLA law students Emma Maynard and Jenny Poretz contributed to the preparation of this brief.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12, 999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date: May 11, 2023                              */s/ Kathrina Szymborski-Wolfkot*
                                                     Kathrina Szymborski-Wolfkot

# CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2023, I electronically filed the foregoing *Brief of Plaintiff-Appellee* with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: May 11, 2023                                          */s/ Kathrina Szymborski-Wolfkot*

                                                              Kathrina Szymborski-Wolfkot